UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM CHARLES JOHNSON,<br><br>Petitioner,<br><br>v.<br><br>MIKE McDONALD, Warden,<br><br>Respondent. | Case No. 11-6655 JST (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner William Charles Johnson, challenging the validity of a judgment obtained against him in state court. Respondent has filed an answer to the petition, and petitioner has filed a traverse. For the reasons set forth below, the petition is denied.

**I.     PROCEDURAL HISTORY**

On June 27, 2008, an Alameda County Superior Court jury found petitioner guilty of attempted first degree murder (Cal. Penal Code §§ 187(a), 664(a)), assault with a deadly weapon (Cal. Penal Code § 245(a)(2)), infliction of injury on a cohabitant (Cal. Penal Code § 273.5(a)), being a felon in possession of a firearm (Cal. Penal Code § 12021(a)(1)), making criminal threats (Cal. Penal Code § 422), and mayhem (Cal. Penal Code § 203). The jury also found true sentence enhancement allegations for use of a firearm and infliction of great bodily injury. At a bench trial on the sentence enhancement allegations for prior convictions, the court found that petitioner had suffered two prior serious felony convictions (Cal. Penal Code § 667) and, at the People's request, struck allegations of four prior prison terms. On December 5, 2008, petitioner was sentenced to 60 years to life in prison.

Petitioner appealed his conviction. The California Court of Appeal affirmed the judgment of conviction in People v. Johnson, 185 Cal. App. 4th 520 (Cal. Ct. App. 2010). The California Supreme Court summarily denied his petition for review.

Petitioner filed two petitions for writ of habeas corpus in the state courts. The Alameda County Superior Court denied his habeas petition in a reasoned decision. The California Supreme Court summarily denied his habeas petition.

In his federal petition for writ of habeas corpus, petitioner asserts: the statute that permits evidence of prior acts of domestic violence to show propensity violates a defendant's rights to due process and to present a defense, the admission of evidence his particular prior acts of domestic violence violated his rights to due process and to present a defense, and, he received ineffective assistance of counsel.

## II. STATEMENT OF FACTS

The California Court of Appeal described the evidence presented at trial:

Defendant, whose nickname was "Mookie," and the victim, Nicole Henderson, had grown up in the same neighborhood in Oakland and had been friends since Henderson's teenage years in the late 1980's. By 2004, they had become romantically involved, and defendant had moved in with Henderson and her two sons about two years before the events in question. The relationship was deteriorating by late 2006 because Henderson could no longer tolerate defendant's drug abuse and his threats against her. She told him that if he could not get off drugs she would leave him. He said if she left, "somebody was going to die." Somebody almost did.

While Henderson was driving defendant to work on December 28, 2006, defendant threatened to shoot her, saying, "I should blow your mother fuckin' head off." He stretched out his left arm and pointed it at her, and she thought he might have a gun. That night Henderson left the house with her son and went to her mother's house to stay, fearing what defendant might do. She knew he had injured a former girlfriend named Amanda, and she had seen him with guns before. The next day Henderson went to court and applied for a restraining order, but one was not issued immediately because of the holidays.

Defendant called Henderson's cell phone several times over the next few days, but she did not answer. She did, however, record the calls, which were played for the jury. Defendant left a message for Henderson on January 1, saying that if she did not apologize to him, he would come to her workplace, would "check [her] ass there," and would "put one in [her]."

2

After receiving that threat, Henderson returned home, changed the locks on the door, and then spent the night at her cousin's house in Richmond. While she was at her house, Henderson noticed that some of defendant's possessions had been moved out, but some were packed up and still sitting in the living room.

Defendant called Henderson early the next morning and told her he wanted to get the rest of his things out of her house, and that he needed some papers he had left there so he could get into a drug treatment program. She told him she would bring the papers to the childcare center where she worked, and he could pick them up there when she arrived at work at 9:00 a.m.

Defendant did not show up until a little after 5:00 p.m., having called to say he was on his way. Henderson went outside and saw him arrive alone in an unfamiliar car.

Defendant parked his car at an odd angle in the daycare parking lot, blocking Henderson's car from exiting. Henderson immediately retrieved the documents from her car and gave them to defendant. People were coming and going through the parking lot as parents picked up their children from the childcare center.

Defendant then asked for the return of some of his fishing gear from Henderson's car and began carrying his possessions from the trunk of her car to the trunk of his car. When he spent time rooting around in Henderson's trunk, trying to find a fishing knife that she told him was not there, Henderson got the feeling defendant was "stalling." Throughout this time, he kept repeating, with increasing anger, "So this is how you want it, huh?" Henderson assured him she was serious about breaking up with him.

Defendant "kept looking around" during this time, inferably waiting for the parking lot to empty. He was wide-eyed and appeared agitated. By the time he finished rummaging through Henderson's trunk, he and Henderson were the only ones left in the parking lot. Finally, defendant returned to the trunk of his car (about ten feet behind where Henderson was standing). Henderson thought he was preparing to leave, and she turned her back to defendant to close the trunk of her own car.

Just then she heard a loud noise that deafened her temporarily. She then heard two or three more shots in rapid succession. (Footnote omitted.) She felt the back of her neck get warm, but did not realize she had been shot until she hit the ground, forehead first. She never saw a gun in defendant's hand, but she knew he owned two guns. Henderson and every other percipient witness testified there was no one else in the car defendant was driving, no one else in the parking lot, and no one else in close proximity at the time of the shooting. Henderson testified she had no other enemies.

After Henderson collapsed, defendant returned to his car, closed the trunk, and drove off. Another witness said he "sped off," "burning rubber." While Henderson lay in the parking lot, she told both a coworker and the responding police officer that her boyfriend "Mookie" had shot her, and she named him at trial as the shooter.

3

Two shots hit Henderson, one in her arm, and one in her back. The shot to her arm left a ten-inch scar and required surgery in which nerves from her leg were removed and transferred into her arm. Though she had previously been left-handed, that arm was badly mangled after the shooting, forcing her to switch hands to write. She had been in physical therapy ever since, but had not recovered full sensitivity or use of her left arm at the time of trial.

The shot to her back was just inches to the right of her spine, and the doctors initially told her she might be paralyzed from the neck down. Fortunately she was not. The bullet fractured two of the wings of her vertebrae on the left side and one of her left ribs, bruised her left lung, and lodged near her left collarbone. It was surgically removed some three weeks later.

Two witnesses—Tara Simpson, who was picking up her son at the daycare center, and her friend, Bonnie Durr, who had driven her there—confirmed that defendant was the man they saw in the parking lot with Henderson just before she was shot. They testified there was no one else in the immediate vicinity. No one, however, saw defendant with a gun.

The defense appeared to be one of mistaken identity. Defense counsel emphasized that neither Simpson nor Durr had confidently identified defendant in photographic lineups.FN3 Members of defendant's legal team were called as witnesses, evidently to cast doubt on Simpson's and Durr's identification testimony.FN4 Defense counsel claimed Simpson and Durr were "mistaken in their identification" and were unwittingly biased.FN5

> FN3. Durr testified that two of the photos looked familiar, and she did not want to accuse the wrong person, so she told the police it was none of them. But when she saw defendant at the preliminary examination she was "certain beyond doubt" he was the man she had seen in the parking lot. Simpson chose two photos as possible suspects, including one of defendant. She also recognized him at the preliminary examination.

> FN4. The lawyer who had represented defendant at the preliminary examination testified that although he had subpoenaed Simpson and Durr, neither had ever told him they recognized defendant when they saw him in court, even though he had since seen both women on several occasions. Defense counsel insinuated that if these witnesses really had recognized defendant at the preliminary examination, they should have told defense counsel about that "mental" identification.

> FN5. This bias supposedly arose from the fact that Simpson and Durr were friends, and Henderson was Simpson's son's teacher at the childcare center. A defense investigator testified that Simpson knew for sure Henderson was her son's teacher at a pretrial interview, whereas she testified at trial she was not sure.

Defense counsel stressed that no one saw defendant with a gun, there was no heated argument in the parking lot, and defendant made no threats just prior to the

4

shooting. He asked the jury to acquit defendant based on a theory that the trajectory of the bullet through Henderson's back excluded him as the shooter. Since the bullet entered Henderson's back on the right side of the spine, but did its internal damage and ultimately lodged on the left side, defense counsel argued that the shooter must have been to Henderson's right when the shots were fired. He could not have been standing where Henderson last saw defendant, which was behind Henderson and to her left. But counsel put forth no theory whatsoever about who the "real" shooter might have been.FN6

> FN6. Prior to trial, defense counsel sought a continuance to investigate a third party culpability theory regarding Charles Dunn, who worked with defendant. Dunn made one telephone call to Henderson, indicating he and defendant would pick up defendant's things from Henderson's house on December 30. Dunn told police he was not present at the time of the shooting and knew nothing about it. Defense counsel offered no evidence to the contrary, and the continuance was denied.

A police witness testified that a bullet hole in the door jamb of the childcare center showed a trajectory consistent with having been fired from the vicinity of Henderson's trunk. The prosecutor also pointed out to the jury that defendant could have moved without Henderson's realizing it, since she had her back to him, or Henderson's own body may have changed position, perhaps by force of the first bullet, which could explain the trajectory of the bullet through her back. He emphasized the prior threats and the uncontradicted testimony by multiple witnesses that no one else was near Henderson at the time of the shooting.

People v. Johnson, 185 Cal. App. 4th 520, 524-28 (Cal. Ct. App. 2010).

## III.  DISCUSSION

### A.  Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams (Terry) v. Taylor, 529 U.S. 362, 412–13 (2000).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

### B. Petitioner's Claims

#### 1. Admission of Prior Domestic Violence Acts Under California Penal Code § 1109

Petitioner challenges the admission of evidence that he shot a second girlfriend in 1988 when she tried to break up with him and shot a third girlfriend in 1992 when she got into an argument with him. He makes what he refers to as facial and as-applied challenges. In his facial challenge, he contends that admission of prior acts evidence under § 1109 to show propensity violates a defendant's rights to due process and to present a defense. In his as-applied challenge,

6

he contends that admission of his particular prior bad acts under § 1109 violated his federal constitutional rights to due process and to present a defense.

### a. The evidence

Under California law, evidence of some prior acts of domestic violence may be admitted to show propensity to commit acts of domestic violence. Three provisions of the California Evidence Code affect the admissibility of this evidence: California Evidence Code § 1101 states the general rule against propensity evidence and notes the exception, § 1109 creates an exception for some domestic violence evidence, and § 352 is a safeguard. California Evidence Code § 1101 provides: "(a) Except as provided in this section and Section[] . . . 1109, evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact . . . other than his or her disposition to commit such an act." Section 1109 provides: "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Cal. Evid. Code § 1109(a)(1). Section 352 permits the court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Cal. Evid. Code § 352.

The prosecutor moved in limine to present evidence of three prior incidents of domestic violence. The trial court ruled that two of the three incidents were admissible under California Evidence Code § 1109, and allowed the presentation of evidence about 1988 events with Amanda Floyd and 1992 events with Lynne Webb.[1] The trial court ruled that the admission of this evidence was warranted "in the interest of justice," the evidence was "more probative than

---

[1] The trial court ruled inadmissible the evidence that petitioner had punched his then-girlfriend Lynne Webb in the jaw during an argument in 1984. This was ruled inadmissible because it did not involve a weapon.

7

1   prejudicial," and would "assist the trier of fact in determining elements and issues that will be
2   relevant in this case."  Resp. Ex. F, RT 16-17.
3   　　　　　The evidence about Amanda Floyd concerned events that transpired when she tried to end
4   her relationship with petitioner in 1988 after she caught him using drugs.  Floyd and petitioner
5   argued on several occasions.  On one occasion, petitioner pointed a gun at her and said he was
6   going to kill her.   Floyd moved to another apartment, but petitioner found her and showed up
7   about two weeks later.  During an argument that went on for several hours, petitioner threatened to
8   burn down the apartment and kill Floyd; he also lit some paper towels and her nightgown on fire
9   and slid them under the door into the bathroom where her young daughter was taking a bath.
10  Petitioner then pointed a gun at Floyd and insisted that she watch him freebase cocaine and drink
11  cognac.  After about twenty minutes, he started to doze off.  When Floyd ran toward the door,
12  petitioner grabbed her by the hair, said he was going to kill her, put the gun to her head, and pulled
13  the trigger three times but the gun did not fire.  As Floyd backed away and tripped, petitioner
14  pulled the trigger again; this time, the gun fired, hitting Floyd near the elbow and breaking her
15  arm.
16  　　　　　The evidence about Lynne Webb concerned an argument that she had with petitioner in
17  1992 when she and petitioner were in a relationship and using drugs.  During the argument,
18  petitioner pulled out a gun and shot Webb in the leg, breaking her femur.

### b.    California Court of Appeal's decision

20  　　　　　The California Court of Appeal rejected petitioner's facial and as-applied challenges to the
21  propensity evidence in a lengthy and reasoned decision that focused on state law issues.  See
22  Johnson, 185 Cal. App. 4th at 528-41.  Although the discussion in that opinion focused on the
23  state law analysis, the decision is entitled to deference under 28 U.S.C. § 2254(d) because the
24  federal due process claim was presented to that court and presumably silently rejected.  "When a
25  federal claim has been presented to a state court and the state court has denied relief, it may be
26  presumed that the state court adjudicated the claim on the merits in the absence of any indication
27  or state-law procedural principles to the contrary."  Harrington v. Richter, 131 S. Ct. 770, 784-85
28  (2011) (one-sentence order denying habeas petition analyzed under §2254(d)); Johnson v.

8

Williams, 133 S. Ct. 1088, 1096 (2013) (order that discusses state law claim but not federal claim rebuttably presumed to be a rejection on the merits and therefore subject to § 2254(d)). Petitioner does not suggest any reason to overcome the presumption that the state appellate court adjudicated his federal claim on the merits.

The California Court of Appeal first rejected the facial challenge to § 1109, and found it constitutional on its face under California's constitution. The court followed the reasoning of People v. Falsetta, 21 Cal. 4th 903, 917 (Cal. 1999), in which the California Supreme Court had upheld the constitutionality of a parallel statute (i.e., California Evidence Code § 1108) that permitted evidence of prior sex offenses in a prosecution for a sex offense. See Falsetta, 21 Cal. 4th at 922 ("We conclude, consistent with prior state and federal case law, that section 1108 survives defendant's due process challenge"). Falsetta had upheld § 1108 because the statute had conditional language that allowed the admission of prior sex offense evidence only if the evidence was not inadmissible under § 352; "[i]t was precisely the incorporation of this safeguard that led the Supreme Court in [Falsetta] to uphold the constitutionality of section 1108 against an attack similar to the one raised here." Johnson, 185 Cal. App. 4th at 529. The California Court of Appeal rejected petitioner's facial attack "as having been settled unfavorably to him" because the state appellate courts, including one in the same division, had "uniformly followed the reasoning of Falsetta in holding section 1109 does not offend due process." Johnson, 185 Cal. App. 4th at 529 (citations omitted).

The California Court of Appeal also rejected petitioner's "as applied" challenge to the § 1109 evidence, again focusing on state law. That court found that the trial court had not abused its discretion in determining that the evidence was not substantially more prejudicial than probative and therefore was admissible under § 1109(a) and § 352. Johnson, 185 Cal. App. 4th at 531-33. The "probative value was great" because the incidents were so similar to the charged offense: in each of the prior cases, "defendant resorted to shooting his girlfriend when she either had decided to break up with him or was actively engaged in an argument with him. Defendant's drug use was a factor in each incident, either in precipitating the breakup, or because defendant was under the influence at the time of the assault, or both. In each case a serious injury was inflicted." Id. at

9

532. "The common factors in all three crimes strongly suggest defendant has a problem with anger management, specifically with regard to female intimate partners, and specifically when he feels rejected or challenged by such a partner. He has demonstrated a pattern of using guns to exact revenge. Whatever the psychological forces at work, the Legislature has concluded that in these types of cases, evidence of past domestic violence is particularly probative of the likelihood to repeat such behavior." Id. at 533. The court also rejected petitioner's central argument that the prior acts were too remote in time to be probative. Id. at 534-36. Even though the prior bad acts had occurred fifteen and nineteen years before the charged offense, the similarities between the prior acts of domestic violence and the charged offenses outweighed the temporal remoteness, and petitioner had not led an unblemished life since their occurrence. See id. at 532-35; see also id. at 534 n.12 (petitioner had been convicted of drug and weapons offenses in 1993, 1999 and 2002, and drugs and weapons were involved in his pattern of domestic violence). The admission of evidence was "in the interest of justice" and therefore overcame the statutory presumption against admissibility for domestic violence acts more than ten years old. See id. at 537-40.

Finally, the California Court of Appeal determined that, even if the evidence was not properly admitted, its admission would have been, at most, harmless error because this was not a close case. Id. at 540-41. "The evidence of guilt was extremely strong." Id. at 540. The victim knew petitioner intimately and conversed with him in the parking lot immediately before she was shot and spontaneously identified him as she lay in the parking lot. Eyewitnesses identified petitioner as the only person near the victim at the time she was shot. It would have been physically impossible for her to shoot herself in the center of her back, and the shooter had been near enough that the first shot temporarily deafened her. "Witnesses inside and outside the childcare center testified the shots came from the vicinity of the daycare center and sounded 'very close,' 'right outside the yard area.'" Id. Petitioner fled the parking lot immediately after the shooting rather than check on the victim. "In light of the foregoing evidence – not to mention defendant's prior threats and proven motive – the far-fetched defense that there was another, phantom gunman in or near the parking lot was, in a word, ludicrous." Id. Also, the jury was instructed repeatedly on the presumption of innocence; the jury was instructed that it was not to

1  conclude that petitioner was a person of bad character due to the prior domestic violence; and the
2  prosecutor did not dwell unreasonably on the prior domestic violence.  A lesser verdict also was
3  not probable under the evidence.  See id. at 541.

### c. Analysis of federal constitutional claims

#### (1) The facial challenge to § 1109

A state's criminal law (such as an evidence law pertaining to criminal trials) does not violate the Due Process Clause "unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Montana v. Egelhoff, 518 U.S. 37 (1996).  "It is not the State which bears the burden of demonstrating that its rule is deeply rooted, but rather respondent who must show that the principle of procedure violated by the rule (and allegedly required by due process) is so rooted in the traditions and conscience of our people as to be ranked as fundamental."  Id. at 47 (quoting Patterson v. New York, 432 U.S. 197, 202 (1977)) (internal quotation marks omitted) (rule that intoxication may be considered on the question of intent was not so deeply rooted as to be a fundamental principle enshrined by the Fourteenth Amendment).  Simply finding a historical basis for or against a rule is not enough: "The Constitution does not encompass all traditional legal rules and customs, no matter how longstanding and widespread such practices may be.  The Supreme Court has cautioned against the wholesale importation of common law and evidentiary rules into the Due Process Clause of [the] Constitution."  United States v. LeMay, 260 F.3d 1018, 1024-25 (9th Cir. 2001).  The "rule or practice must be a matter of 'fundamental fairness' before it may be said to be of constitutional magnitude."  Id. at 1025 (quoting Dowling v. United States, 493 U.S. 342, 352 (1990)); e.g., id. at 1025-26 (in light of historic record that was not clear as to whether propensity evidence is prohibited, it cannot be said that there is a fundamental principle of justice prohibiting the use of propensity evidence).

The Supreme Court has expressly left open the question of whether admission of propensity evidence violates due process: "we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."  Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991).  Based on the

11

Supreme Court's statement in Estelle v. McGuire, the Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established law as required for purposes of § 2254(d). See Alberni v. McDaniel, 458 F.3d 860, 866-67 (9th Cir. 2006); Larson v. Palmateer, 515 F.3d 1057, 1066 (9th Cir. 2008); Garceau v. Woodford, 275 F.3d 769, 774-75 (9th Cir. 2001), reversed on other grounds, 538 U.S. 202 (2003). The absence of a Supreme Court holding that admission of propensity evidence violates due process precludes relief under § 2254(d) on petitioner's facial challenge to California Evidence Code § 1109. See generally Carey v. Musladin, 549 U.S. 70, 77 (2006) (given the lack of holdings from the Supreme Court on point, it cannot be said that the state court unreasonably applied clearly established federal law for purposes of § 2254(d)(1)).

### (2) The as-applied challenge to the prior bad acts evidence

Petitioner contends that the admission of evidence of his particular bad acts violated his right to due process. Petitioner argues that the trial court failed to properly apply California Evidence Code § 1109(e) to the prior bad acts evidence and that the evidence should have been excluded under § 352. See ECF No. 1 at 21-28.

Federal habeas relief is unavailable for violations of state law or for alleged error in the interpretation or application of state law. See Swarthout v. Cooke, 131 S. Ct. 859, 861-62 (2011). A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. See Pulley v. Harris, 465 U.S. 37, 41 (1984). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established federal law under § 2254(d)).

Here, the state appellate court determined that the prior bad acts evidence was admissible under state law. A state court's interpretation of state law, including one announced on direct

12

appeal of the challenged conviction, binds a federal court sitting in habeas corpus. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Hicks v. Feiock, 485 U.S. 624, 629 (1988) (even a determination of state law made by an intermediate appellate court must be followed). Petitioner's claim that the admission of the evidence violated his right to due process is premised on his assertion that state law was improperly applied to his case, but this court is bound to accept the state appellate court's determination that state law was properly applied in his case. Therefore, his due process claim fails.

In his federal habeas petition, petitioner contends that the admission of the prior domestic violence evidence also violated his right to present a defense. Other than briefly mentioning the right to present a defense, he does not further develop this argument or explain how the right was even implicated. Under certain circumstances, the right to present a defense may be violated by the exclusion of evidence, by limitations on the defendant's closing argument, or by limitations on his ability to call witnesses. See, e.g., Nevada v. Jackson, 133 S. Ct. 1990, 1992 (2013) (limitations on evidence); Herring v. New York, 422 U.S. 853, 858 (1975) (closing argument); Washington v. Texas, 388 U.S. 14, 19 (1967) (witness testimony). But petitioner has identified no Supreme Court case holding that the right to present a defense is infringed by the admission of evidence favorable to the prosecution. He also has not shown that the California Court of Appeal's rejection of his claims regarding the propensity evidence was contrary to or an unreasonable application of any clearly established law from the Supreme Court on the right to present a defense. Accordingly, this argument must be rejected.

### (3) Admission of the evidence was harmless, if it was erroneous

Even assuming the propensity evidence was improperly admitted, the error did not have a "'substantial and injurious effect'" on the verdict. See Plascencia v. Alameida, 467 F.3d 1190, 1203 (9th Cir. 2006) (applying Brecht v. Abrahamson, 507 U.S. 619 (1993), harmless error analysis to claim that admission of evidence was improper). Although the harmless error test is not just a determination of whether the other evidence was sufficient to support the verdict, the reviewing court does consider all the evidence to determine whether an error had a substantial and

injurious effect on the verdict, so that an error is more likely to be considered harmless when the rest of the case against a defendant is particularly strong. See Sims v. Brown, 425 F.3d 560, 570-71, amended by 430 F.3d 1220 (9th Cir. 2005).

Here, the other evidence against petitioner was overwhelming. With regard to the shooting charged in the present case, the victim knew petitioner well; the victim testified that she had been talking to petitioner and was shot when she turned her back to him; the victim testified that the sound of the gunshots temporarily deafened her; the victim and two other witnesses placed only petitioner in the immediate vicinity of the victim at the time she was shot; and petitioner fled the scene immediately after the shooting. Although no one saw petitioner with a gun or saw the shooting as it occurred, the percipient witnesses placed him and only him in the vicinity of the victim when she was shot at close range. Additionally, petitoiner had threatened the victim shortly before the shooting, and the jury was able to hear his recorded message from the day before the shooting in which he said that if she did not apologize, he would come to her workplace and would "put one in [her]." Also, even if the prior bad acts evidence was not admissible to show propensity, the trial court had ruled at the in limine hearing that petitioner's prior incidents of domestic violence were admissible to "assist the trier of fact in determining the motive and intent of the defendant as well as the lack of mistake that may have been involved." Resp. Ex. F, RT 18; see Cal. Evid. Code § 1101(b) (evidence of other crimes and bad acts not inadmissible when relevant to prove, e.g., motive, opportunity, intent, and absence of mistake). Further, the jury was instructed on the presumption of innocence and not to conclude that he was a person of bad character due to the prior domestic violence. Any error in the admission of the propensity evidence did not have a substantial and injurious effect on the verdict. For all these reasons, petitioner is not entitled to relief on his facial and as-applied challenges to the propensity evidence.

### 2. Ineffective Assistance of Counsel Claim

Petitioner urges that his trial counsel provided ineffective assistance in that counsel failed to present expert witnesses, failed to object to the trial testimony of Amanda Floyd, failed to call witnesses to testify that petitioner was not on drugs at the time of the shooting, relied on an ineffective defense theory, and improperly advised petitioner not to testify.

14

### a. State court proceedings

Petitioner presented his ineffective assistance of counsel claim in a state habeas petition. The Alameda County Superior Court denied relief on this claim because it was untimely and failed to state a prima facie case for relief. Resp. Ex. E, In re. Johnson, Alameda County Superior Court Case No. 155055, Order Denying Petition For Writ of Habeas Corpus at 4-5. The superior court cited the key Supreme Court case, correctly articulated the standard of review, and rejected the claim for lack of prejudice: "As the court of appeal so ably put it, '[i]n light of the foregoing evidence–not to mention [Petitioner's] prior threats and proven motive–the far-fetched defense that there was another phantom gunman in or near the parking lot was, in a word, ludicrous.' [Citation.] On this record, there is no reasonable probability that Petitioner would have received a verdict more favorable to him in the absence of any of the alleged deficiencies of his trial counsel." Id. (quoting Johnson, 185 Cal. App. 4th at 540). The California Supreme Court summarily denied a later petition raising the same claims. As the last reasoned decision from a state court, the Alameda County Superior Court's order denying relief is the decision to which § 2254(d) applies. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

### b. Analysis

The Sixth Amendment to the U.S. Constitution guarantees not only assistance, but effective assistance, of counsel. See Strickland v. Washington, 466 U.S. 668, 686 (1984). The purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. To prevail on an ineffective assistance of counsel claim, a habeas petitioner must show that (1) counsel's performance was "deficient," i.e., his "representation fell below an objective standard of reasonableness" under prevailing professional norms, id. at 687-88, and (2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, see id. at 691-94. Because both § 2254 and Strickland are highly deferential, "[e]stablishing that a state court's application of Strickland

1  was unreasonable under § 2254 is all the more difficult." Harrington v. Richter, 131 S. Ct. 770,
2  788 (2011). When, as here, § 2254(d) applies to a Strickland claim, "the question is not whether
3  counsel's actions were reasonable. The question is whether there is any reasonable argument that
4  counsel satisfied Strickland's deferential standard." Harrington, 131 S. Ct. at 788. Finally, "[i]f it
5  is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which
6  we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.
7        With these standards in mind, the court now considers the alleged failings of trial counsel.
8        <u>Failure to present expert testimony</u>: Petitioner contends that trial counsel was ineffective
9  in that he failed to obtain a forensics expert "who could have explained to the jury the question of
10  trajectory, a key issue to petitioner's defense." ECF No. 1 at 30. He contends that this was a key
11  issue because no one actually saw the shot fired or saw the shooting; instead, the witnesses'
12  testimony was that he was in the vicinity at the time of the shooting and had not actually placed
13  him in the specific location from which the prosecutor argued the shots were fired. He argues that
14  the absence of this evidence left him "without an expert to support his defense that he was not the
15  shooter." ECF No. 13 at 15. The state court rejected this claim on the ground that petitioner failed
16  to show any prejudice, even assuming for the sake of argument that petitioner's counsel's
17  performance was objectively unreasonable.
18        The state court's rejection of this claim for lack of prejudice was not contrary to or an
19  unreasonable application of Strickland. "[T]he question is whether there is a reasonable
20  probability that, absent the errors, the factfinder would have had a reasonable doubt respecting
21  guilt." Strickland, 466 U.S. at 695; see, e.g., Hinton v. Alabama, 134 S. Ct. 1081, 1089 (2014)
22  (determining that counsel's failure to request additional funds to replace an inadequate expert due
23  to counsel's mistake of law about funding cap was deficient performance, and remanding case for
24  lower court to determine whether "there is a reasonable probability that [defendant's] attorney
25  would have hired an expert who would have instilled in the jury a reasonable doubt as to
26  [defendant's] guilt"). In light of the evidence of petitioner's prior threats, petitioner's presence in
27  the vicinity of the shooting, and petitioner's flight from the scene, it was not unreasonable for the
28  state court to conclude that petitioner had not shown a reasonable probability of a different

outcome had an expert been obtained to challenge details such as bullet trajectories, entry and exit wounds, and the victim's position at the moment she was shot. Petitioner also does not describe what the expert's findings would have been if he had been retained; petitioner's speculation that an expert could have provided helpful information is not sufficient to show a reasonable likelihood that the result of the proceedings would have been different if an expert had been consulted and testified. See Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation about what an expert could have said is not enough to establish prejudice"); see also Gonzalez v. Knowles, 515 F.3d 1006, 1015-16 (9th Cir. 2008) (prejudice not demonstrated where petitioner did not state that he suffered from a mental illness and instead contended that if tests had been done, and if they had showed he had brain damage or trauma, they might have resulted in a lower sentence). In fact, unless such testimony would have shown that the shot was fired from a location at which petitioner could not have been physically located – and there is nothing in the record to support that suggestion – the evidence would have been of no value at all.

Failure to object to Amanda Floyd's trial testimony: Petitioner contends that defense counsel was ineffective in failing to object to the testimony of Amanda Floyd about his bad acts in 1988 other than shooting her, arguing that counsel's failure to challenge her testimony under California Evidence Code § 352 and on due process grounds allowed her to testify to uncharged and unproven criminal acts surrounding the assault with a deadly weapon charge of which he had been convicted. He focuses on counsel's failure to object to the evidence of his verbal threats, use of cocaine in front of her, holding a gun to her head, trying to shoot her, and trying to push lighted materials under the bathroom door where her daughter was bathing. Petitioner contends that this was extremely prejudicial and highly inflammatory testimony as it included information about attempted arson and attempted child endangerment. Petitioner further contends that defense counsel failed to cross-examine Floyd regarding her preliminary hearing testimony.

Counsel did attempt to cause the exclusion of evidence that petitioner had shot Amanda Floyd. See Resp. Ex. G, CT 169, 171, 180. After he argued unsuccessfully at the in limine hearing that this evidence should be excluded, there was no reasonable likelihood of a different result had counsel raised the same objections during trial with respect to the evidence that

petitioner shot Floyd. With respect to counsel's failure to object to evidence of the particulars of his bad acts, the Alameda County Superior Court's decision that there was no prejudice was not an unreasonable application of Strickland. It can be said with certainty that, even if counsel had objected to and caused these details of his past misconduct to be excluded, there is no reasonable probability the outcome of the trial would have been different.

Failure to present evidence that petitioner was not on drugs: Petitioner contends that defense counsel failed to comply with his request to call several witnesses (i.e., his parole officer, drug program counselor, and co-workers) to testify that he was not on drugs at the time of the shooting and had passed drug tests while on parole. This allegedly would have contradicted the victim's testimony and challenged her credibility.

The state court's rejection of this claim for lack of a showing of prejudice was not an objectively unreasonable application of Strickland. First, that certain unnamed witnesses might have testified that petitioner was not on drugs at times other than the shooting constitutes little to no evidence that he was on drugs when the shooting occurred. This would have been, at best, weak impeachment of a collateral point in the prosecution's case. Second, as the state court explained, the evidence was very strong and his theory that another, unidentified gunman committed the shooting was far-fetched. The victim was indisputably shot and severely wounded, and the evidence was that petitioner was the only person in the victim's immediate vicinity at the time of the shooting, and that he fled the scene immediately afterwards. There is no reasonable probability of a different outcome had defense counsel presented evidence that petitioner was not on drugs at around the time of the shooting.

Reliance on ineffective defense theory: Petitioner contends that counsel's reliance on solely a theory of mistaken identity was "an inherently ineffective defense" because the victim knew him so well. ECF No. 1 at 32. Further, counsel failed to present the "meritorious defense" that someone other than him "was present at the scene and fired the shot that hit" the victim. Id. His preferred defense would have been supported by evidence that no one saw him holding a gun, and the victim was turned away from him when shot so she couldn't see who fired at her.

The main problem with this argument is that there is no evidence to support the defense

that petitioner's counsel supposedly should have mounted. To suggest that someone else pulled the trigger requires identifying who that "someone else" might have been. The state court's determination that there was no showing of prejudice from defense counsel arguing a mistaken-identity defense was not contrary to or an unreasonable application of Strickland.

Advice to petitioner not to testify: Petitioner contends that counsel provided ineffective assistance in advising him that "testifying would be fatal to his case, in light of his prior convictions." ECF No. 1 at 32. He contends that there "would have been no disadvantage" to him testifying because the evidence of his prior convictions already had been admitted and testified to by several witnesses. Id. at 32-33.

The state court's determination that petitioner did not satisfy the prejudice prong on this ineffective assistance claim was not an objectively unreasonable application of Strickland. As the state habeas court explained, the evidence was very strong and his theory of another gunman who committed the shooting was far-fetched.

This claim also fails on the deficient performance prong of the Strickland analysis because petitioner does not show that counsel's advice to him not to testify amounted to representation that "fell below an objective standard of reasonableness" under prevailing professional norms. Strickland, 466 U.S. at 687-88. Defense counsel reasonably could have determined that, although some evidence had been admitted of petitioner's prior bad acts, the prosecutor could have elicited even more damaging evidence if petitioner took the stand. See Matylinsky v. Budge, 577 F.3d 1083, 1097 (9th Cir. 2009) (state court was not unreasonable in finding no ineffective assistance in counsel's decision not to put the defendant on the stand when defendant testifying would have done more harm than good because, among other things, he "would have been subjected to damning cross-examination on his prior convictions"). Petitioner could have been asked about his motivation in committing those prior shootings and could have been asked to distinguish those shootings from the current one, and almost any answer would have been quite damaging to him, because the examination itself would have emphasized the petitioner's propensity to use firearms to settle scores with his female companions. There also were facts about the present crime that made testimony from the defendant undesirable: he could have been asked about his several

19

threats to kill the victim and he could have been asked about why he fled the scene immediately after the victim was shot. He does not explain what testimony he could have given that would have done more good than harm to the defense on these points. There were many bad facts for petitioner and his testimony would have exposed them in greater detail to the jury. Counsel's decision to advise him not to testify was not deficient performance given the circumstances.

<u>Cumulative effect</u>: Even assuming for the sake of argument that petitioner's counsel's conduct was objectively unreasonable, and considering the alleged deficiencies cumulatively, the ineffective assistance of counsel claim still fails on the prejudice prong. The evidence was so overwhelmingly against petitioner – his prior shootings of girlfriends, his threats to kill this girlfriend, his presence at the time of the shooting, and his abrupt departure from the scene after this girlfriend was shot – that, even if counsel had done all the things petitioner urges he should have done, there was no reasonable probability of a different outcome. The state court's rejection of petitioner's ineffective assistance of counsel claim was not an unreasonable application of <u>Strickland</u>. Petitioner is not entitled to the writ on his ineffective assistance of counsel claim.

### C. No Certificate Of Appealability

A certificate of appealability will not issue. See 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

## IV. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: July 9, 2014

_____
JON S. TIGAR
United States District Judge